# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00280-CV

**Joe McHaney d/b/a Envirosol Environmental Services, Appellant**

**v.**

**Texas Commission on Environmental Quality, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
### NO. D-1-GN-09-003350, HONORABLE GISELA D. TRIANA, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The Texas Commission on Environmental Quality commissioners concluded that Joe McHaney d/b/a Envirosol Environmental Services violated TCEQ regulations. TCEQ assessed $29,903 in penalties, $22,500 of which were based on McHaney's failure to make five hazardous-waste determinations. McHaney appeals from the district court's judgment affirming TCEQ's order, contending that the district court should have reversed the order because the commissioners (1) violated his due process rights by penalizing him on a theory that he did not get a meaningful chance to refute, (2) erred by modifying the administrative law judge's findings without legal or factual justification in the record, and (3) impermissibly tried to resolve the "paradox of no documentation" through ad hoc rulemaking in an enforcement proceeding rather than formal rulemaking. We will affirm the judgment.

## BACKGROUND

McHaney ran Envirosol, a waste management facility that handled wastes including paint products and oily water. The facility caught TCEQ investigator Jim Kerlin's attention when he drove past and noticed several 55-gallon drums sitting outside. Kerlin photographed the facility, then returned two weeks later. He said he saw rusting, bulging, and leaking containers—some labeled, some not. He notified McHaney of possible regulatory violations from the failure to properly characterize waste on the property. McHaney provided some documentation identifying wastes received and sent elsewhere, but Kerlin was not satisfied that McHaney had made the waste determinations and classifications required by regulations.

Kerlin filed an investigative report noting that wastes were stored at Envirosol in about six hundred 55-gallon drums, nine "tote tanks," and one 1,600-gallon tank. The investigative report described six waste streams: (1) "universal waste"[1] accumulated for less than a year, (2) universal waste accumulated for more than one year and regulated as solid waste, (3) hazardous

---

[1] "Universal waste" was defined by regulation in effect in 2005 to be

(i) batteries, as described in 40 CFR § 273.2;

(ii) pesticides, as described in 40 CFR § 273.3;

(iii) thermostats as described in 40 CFR § 273.4;

(iv) paint and paint-related waste as described in § 335.262(b) of this title (relating to Standards for Management of Paint and Paint-Related Waste); and

(v) lamps, as described in 40 CFR § 273.5.

30 Tex. Admin. Code § 335.261(b)(16)(F) (2005) (Tex. Comm'n on Envtl. Quality, Universal Waste Rule). McHaney undisputedly collected paint and paint-related waste.

and nonhazardous wastes transported to and stored at the site for more than ten days, (4) industrial and hazardous recyclable material transported to the site and stored for greater than twenty-four hours, (5) hazardous and nonhazardous wastes generated from on-site activities, and (6) the contents of the 1,600-gallon tank prior to shipping wastes to an unauthorized facility.

TCEQ's executive director filed a notice of enforcement alleging that McHaney failed to keep records of waste activities regarding the type, amounts, location, and disposition of wastes generated and/or stored at the facility. He also alleged that hazardous waste determinations had not been made on six waste streams stored in six hundred 55-gallon drums, nine tote tanks, and one 1,600-gallon tank. TCEQ's executive director recommended penalties of $52,628, including a $27,000 fine for the failure to make the determinations.

At the hearing before an administrative law judge, McHaney and TCEQ's Kerlin agreed that the paperwork requirements for universal waste are not as stringent as those for other wastes, but Kerlin asserted that McHaney had the burden to demonstrate through documentation, testing, or some other methodology that he characterized the waste as required. Kerlin testified that streamlined record-keeping requirements might allow universal waste facilities to maintain compliant records that obscured noncompliance with categorization requirements, thereby making enforcement essentially impossible—a situation described as the "paradox of no documentation."

The ALJ who held the hearing recommended dismissing several allegations but recommended $51,453 in penalties on the remaining violations, including $27,000 for the failure to make necessary determinations. A second ALJ who addressed the parties' exceptions to that recommendation stated that documents showing that wastes from six streams were brought to

3

a facility did not prove that wastes from those six categories were still at the facility. The second ALJ opined, however, that McHaney violated regulations by failing to make a hazardous-waste determination regarding each of 410 containers—the 1,600-gallon tank, the nine tote tanks, and four hundred 55-gallon drums—which, with adjustments, would result in a $2.05 million fine. Because that amount far exceeded any fine sought previously, the second ALJ proposed a fine for six failures, which would equal the $27,000 fine previously requested by the TCEQ executive director.

The TCEQ commissioners agreed with the finding that McHaney failed to make the requisite determinations on at least the 410 containers described by the second ALJ, but took a slightly different approach in calculating and assessing the penalty. They divided the containers into five "discrete areas of observation," including three groups of drums (outside along the southwest to eastern portions of the site, in a stationary box trailer located on the eastern portion of the site, and inside a building), nine tote tanks, and one 1,600-gallon tank. TCEQ fined McHaney $4,500 for one violation in each group for a total of $22,500, and assessed various other penalties that resulted in a grand total of $29,903 in fines. The district court affirmed TCEQ's order.

## REGULATORY FRAMEWORK

Generators of waste are required to determine if their waste generated is hazardous under Texas law and federal regulations and must classify any solid waste deemed nonhazardous. 30 Tex. Admin. Code §§ 335.62, .503 (2005) (Tex. Comm'n on Envtl. Quality, Hazardous Waste Determination and Waste Classification, Waste Classification and Waste Coding Required). The term "generator" includes any person who possesses municipal hazardous waste or industrial solid

4

waste to be shipped to any other person and any person whose act first causes the solid waste to become subject to regulation under this chapter. *See id.* § 335.1(65).

Generators can determine whether a waste is hazardous by testing it or by applying "process knowledge." *See id.*; *see also* 40 C.F.R. § 262.11(c)(1)-(2). Process knowledge is the application of knowledge of the hazardous characteristic of the waste in light of the materials or the processes used. 40 C.F.R. § 262.11(c)(2). Process knowledge must be documented and maintained onsite. *See* 30 Tex. Admin. Code § 335.511(a) (2005) (Tex. Comm'n on Envtl. Quality, Use of Process Knowledge). Generators may also classify waste using material safety data sheets, manufacturers' literature, or other documents. *Id.*

If waste is nonhazardous, the generator must classify it as Class 1, 2, or 3. *Id.* §§ 335.62, .503. To classify the nonhazardous waste, generators may use administrative criteria, use process knowledge, classify it as "special solid industrial waste," or classify it as Class 1 nonhazardous waste without conducting any supporting analysis. *See id.* § 335.503(4); *see also id.* §§ .505-.508, .511, .513.

Generators of hazardous or industrial solid waste (except for nonhazardous recyclable materials regulated pursuant to § 335.24(h) of Title 30 of the Texas Administrative Code) must keep records of all hazardous and industrial solid waste activities regarding the quantities generated, stored, processed, and disposed of on-site or shipped off-site for storage, processing, or disposal and which, at a minimum, includes the following information:

> (A) the description, character, and classification of each waste, and any changes and additional information required under § 335.6(c) and (d) of this title (relating to Notification Requirements);

5

(B) the quantity generated;

(C) except for conditionally exempt small quantity generators regulated under § 335.78 of this title (relating to Special Requirements for Hazardous Waste Generated By Conditionally Exempt Small Quantity Generators), the quantity held in on-site storage as of December 31 of each calendar year;

(D) the quantity processed or disposed of at each on-site facility unit during the calendar year;

(E) the method of storage, processing, or disposal as described by codes listed on the form or instructions;

(F) the quantity shipped off-site for storage, processing, or disposal each calendar year, including the name, address, and location of each off-site facility and transporter receiving shipments;

(G) the location of all hazardous waste accumulation areas, situated at or near any point of generation, where hazardous wastes under the control of the operator of the process generating the wastes are placed in containers and initially accumulated without a permit or interim status in accordance with § 335.69(d) of this title (relating to Accumulation Time).

30 Tex. Admin. Code § 335.9(a)(1) (2005) (Tex. Comm'n on Envtl. Quality, Recordkeeping and Annual Reporting Procedures Applicable to Generators). The records may be in any format that is retrievable and easy to copy and must be sufficiently detailed and complete to support any contentions or claims made by the generator with respect to the above-listed information. *Id.*

Paint and paint-related waste are universal waste, which is hazardous waste but is subject to alternative sets of management standards in lieu of standard hazardous-waste regulations. *See id.* §§ 335.261(a) (adopting 40 C.F.R. part 273), .261(b)(16)(F)(iv), .262 (Standards for Management of Paint and Paint-Related Waste). The regulations do not specify what form of records must be kept, but allow "standard business records" such as a log, invoice, manifest,

6

bill of lading, or other shipping document that shows when a waste arrived at and left a facility. *See* 60 Fed. Reg. 25,530. A handler of universal waste must be able to "demonstrate the length of time that the universal waste has been accumulated from the date it becomes a waste or was received." 40 C.F.R. §§ 273.15(c), .35(c). The regulations permit a generator to track universal waste by accumulating universal waste in a container marked with the earliest date that any such waste was placed in that container or by maintaining an on-site inventory system that identifies the date universal waste either became a waste or was received. *See id.* Keeping track of when a waste was created or received is required because of limits on the amount of time universal waste may be retained. *See id.* § 273.35(a), (b).

At the contested-case hearing on the alleged violations of these provisions, the executive director had the burden to prove by a preponderance of the evidence the occurrence of any violation and the appropriateness of any proposed technical ordering provisions. *See* 30 Tex. Admin. Code § 80.17 (2005) (Tex. Comm'n on Envtl. Quality, Burden of Proof).

## STANDARD OF REVIEW

We review TCEQ's decision under the "substantial evidence" standard. *See* Tex. Health & Safety Code § 401.240(a). This standard requires that we reverse or remand a case for further proceedings only "if substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions":

(A) are in violation of a constitutional or statutory provision;

(B) are in excess of the commission's statutory authority;

7

(C) are made through unlawful procedure;

(D) are affected by other error of law;

(E) are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id*. § 401.240(b)(2). Essentially, this standard of review is a rational-basis test to determine, as a matter of law, whether an agency's order finds reasonable support in the record. *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452-53 (Tex. 1984). "The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency." *Id.* at 452.

We apply this analysis without deference to the district court's judgment on review of the agency's decision. *County of Reeves v. Texas Comm'n on Envtl. Quality*, 266 S.W.3d 516, 528 (Tex. App.—Austin 2008, no pet.) (citing *Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006)). We must sustain the agency's action if it is supported by substantial evidence, meaning that the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Charter Med.-Dallas*, 665 S.W.2d at 453 (citing *Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 364 (Tex. 1983)). The substantial-evidence standard does not require "a large or considerable amount of evidence"—in fact, the evidence may even preponderate against the agency's finding—but requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact." *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied).

Likewise, we "may not substitute [our] judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion." Tex. Health & Safety Code § 401.240(b).

## DISCUSSION

McHaney complains that TCEQ violated his due-process rights, erred by modifying the ALJ's findings without justification, and improperly used an enforcement proceeding to alter regulations rather than using the formal rulemaking process.

### The charge provided sufficient notice of the violations found

McHaney contends that TCEQ violated the federal and state constitutions because it fined him $22,500 without providing him sufficient notice of the violations for which he was punished. He also contends that the notice violated the Administrative Procedure Act by punishing him for violations not pleaded or proved. *See* Tex. Gov't Code § 2001.051. He contends that he did not get any notice that TCEQ would assess a penalty based on geographical groupings of waste containers.

The State must provide a person alleged to have violated regulations with notice of and a meaningful opportunity to refute the legal theory on which a fine would be based. *See University of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 930 (Tex. 1995). "To be meaningful, the notice and hearing, which due process requires, implies previous notice and a hearing relative to the issues of fact and law that will control the result to be reached by the agency." *Texas State Bd. of Pharmacy v. Seely*, 764 S.W.2d 806, 814 (Tex. App.—Austin 1988, writ denied) (emphases from

9

original omitted) (citing *Morgan v. United States*, 304 U.S. 1, 18-19 (1938)); *see also Barton v. State Bd. for Educator Certification*, 382 S.W.3d 405, 411 (Tex. App.—Texarkana 2012, pet. denied). McHaney contends that the penalty assessed was based on a geographical subdivision of the waste containers that was never alleged, that TCEQ commissioners concocted the theory after all hearings were held, and that the penalty was assessed based on geography-related amendments to the proposed findings and conclusions that were not supported by substantial evidence. McHaney urges that TCEQ's actions are inconsistent with the holdings in *Barton*, 382 S.W.3d at 411, and *Seely*, 764 S.W.2d at 814.

In *Barton*, the Texarkana court of appeals overturned an agency's reprimand of a school principal because the order was inconsistent with the original allegations. *See* 382 S.W.3d at 411-12. The State Board of Educator Certification alleged that Barton, a school principal, had impermissibly unilaterally changed students' individual educational plans without advance notice to parents. *Id.* at 412. Barton argued that IEPs could be amended by agreement, that the parents were orally notified of proposed changes, and that the parents agreed to the changes made. *Id.* The Board nevertheless reprimanded Barton because she had not given *written* notice to the parents, and the trial court affirmed. *Id.* at 407. The court of appeals reversed, first finding that the Board had not pled that Barton was required to give written notice and that Barton was not given an opportunity to defend against that alleged failure, and then concluding that the Board could not reprimand Barton on such unnoticed grounds. *Id.* at 412-14.

In *Seely*, this Court affirmed a district court's reversal of an agency's license revocation order. *See* 764 S.W.2d at 815. The Board originally notified Seely that it was

10

considering revoking his license for unprofessional conduct for dispensing a prescription outside the usual course of professional practice and in a manner not consistent with public health and welfare. *Id.* at 808-09. It also listed the fact that Seely filled multiple prescriptions of a particular medication for 199 people. *Id.* at 808. The notice, however, did not inform Seely that his license was subject to revocation for violating a Board policy limiting the number of permissible prescriptions of this medication. *Id.* at 814. This Court held that the general allegations of violations of the professional conduct regulations did not reasonably allege a violation of the specific limitation of prescriptions. *Id.* at 815. This Court concluded that the Board denied Seely a meaningful hearing and due process when revoking his license on that unalleged basis. *Id.*

McHaney contends that TCEQ similarly assessed the penalty relating to the failure to make hazardous-waste determinations based on a legal rationale that is unrelated to the executive director's original allegations. In his preliminary report and petition, TCEQ's executive director alleged that McHaney violated various regulations, including the following:

> 30 TEX. ADMIN. CODE § 335.62 and 40 CFR § 262.11, by failing to conduct adequate hazardous waste determinations on wastes generated and stored at the Facility. Specifically, <u>a hazardous waste determination had not been performed on six **waste streams**</u> stored in <u>600 55-gallon drums, 9 tote tanks, and one 1,600 gallon stationary tank</u>.

(Emphases added.) McHaney argues that this charge did not give him adequate notice to prepare for the application of TCEQ's penalty policy that one penalty event could be assessed for every discretely occurring violation, including each failure to perform a hazardous waste determination where required. Based on this policy, the second ALJ proposed finding that McHaney committed

11

410 violations "by failing to conduct hazardous waste determinations on the 1,600-gallon tank, the nine tote tanks, and the 400 drums." This proposed finding was the precursor of the finding in TCEQ's final order for which McHaney argues the original charge did not give him sufficient notice:

> The Respondent violated 30 TAC § 335.62 and 40 C.F.R. § 262.11 at least 410 times by failing to conduct hazardous waste determinations on the 1,600-gallon tank, the nine tote tanks, and the 400 drums. However, the Commission determined that the penalty should be assessed based on five **discrete areas of observation**, which were documented during the investigation as reflected in Exhibit ED-3 that included: 1) drums stored outside the facility along the southwest to eastern portions of the site; 2) drums stored in a stationary box trailer located on the eastern portion of the site; 3) drums stored inside the building; 4) nine tote tanks; and 5) one 1,600 gallon tank.

(Emphases added.) Essentially, McHaney focuses on the bolded portions of the excerpts from the charge and final order as showing a lack of notice for an evolving theory of liability, while TCEQ focuses on the underlined portions as showing consistency in the basis for the notice and penalty. McHaney contends that the executive director's original formulation defined the six waste streams based on how long the facility had stored the waste—not by geographic location and not on a per-container basis—and that the unchallenged determination by the commissioners that the executive director had not proved many of the original allegations should have ended the case.

The excerpts above, however, show that the initial charge gave adequate notice of the basis for the penalty. Unlike in *Barton*, in which the agency during the course of the proceeding improperly redefined the conduct it sought to punish, and in *Seely*, in which the agency applied norms and a penalty not mentioned in the original allegations, TCEQ imposed a fine for instances of noncompliance within the scope alleged in the original notice. The types and number of containers mentioned by TCEQ in its order were within the types and numbers mentioned in the

12

original notice, and the inaction for which McHaney was punished—the failure to determine and classify the nature of the wastes in those containers—was the behavior originally alleged to violate the regulations. The number of violations and the amount of the fine assessed was less than that originally sought. TCEQ did not violate due process by failing to amend its pleadings because the pleadings provided McHaney notice of the nature of the misconduct of which he was accused and the amount of the fine he was assessed.

**TCEQ did not err by modifying the ALJ's findings and conclusions.**

McHaney complains that the Commission erred by departing from the ALJ's proposed findings and conclusions concerning the penalty assessed without proper explanation. In Finding of Fact 48, TCEQ reduced the monetary penalty and changed the description of the grouping of the improper conduct from the ALJ's recommendation. Text added by commissioners is underlined, text deleted is underlined and struck through:

> 48. The Commission assesses ~~ED seeks~~ an administrative penalty of $22,500 ~~27,000~~ for Respondent's failure to conduct adequate hazardous waste determinations on wastes generated and stored at the Facility, a major potential for release on the environmental, property, and human health matrix (a $10,000 base penalty with a downward adjustment of $5,000, for a $5,000 base penalty subtotal, and a total violation base penalty, based on five discrete areas of observation ~~six single violation events~~, of $25,000 ~~30,000~~, with a 10 percent credit for compliance history). Respondent derived an economic benefit of $55 through noncompliance.

TCEQ also changed some language in Conclusion of Law 45:

> 45. The Respondent violated 30 TAC § 335.62 and 40 C.F.R. § 262.11 at least 410 times by failing to conduct hazardous waste determinations on the 1,600-gallon tank, the nine tote tanks, and the 400 drums. However, the Commission determined

13

~~that the penalty should be assessed based on five discrete areas of observation, which~~
~~were documented during the investigation as reflected in Exhibit ED-3 that included:~~
~~1) drums stored outside the facility along the southwest to eastern portions of the site;~~
~~2) drums stored in a stationary box trailer located on the eastern portion of the site;~~
~~3) drums stored inside the building; 4) nine tote tanks; and 5) one 1,600 gallon tank.~~
~~in the EDPRP and the notice of hearing, the Respondent was only notified that he~~
~~was subject to penalty for six violations of those rules~~

McHaney contends that TCEQ did not adequately justify these changes as required by Texas Natural Resources Code § 2003.047(m), which provides in relevant part as follows:

> The commission may amend the proposal for decision, including any finding of fact, but any such amendment thereto and order shall be based solely on the record made before the administrative law judge. Any such amendment by the commission shall be accompanied by an explanation of the basis of the amendment.

We must review whether altered findings and conclusions are supported by substantial evidence. *See* Tex. Gov't Code § 2001.174; *see also Slay*, 351 S.W.3d at 551-52. McHaney contends that assessing the penalty by a geographical grouping is not authorized by statute or regulation and is inconsistent with caselaw. He further contends that the subdivision is not supported by substantial evidence.

TCEQ's departure from the proposal for decision does not conflict with relevant law.

Texas Water Code § 7.053 directs the commission to consider the following factors when determining the amount of an administrative penalty:

> (1) the nature, circumstances, extent, duration, and gravity of the prohibited act, with special emphasis on the impairment of existing water rights or the hazard or potential hazard created to the health or safety of the public;

14

(2) the impact of the violation on:

    (A) air quality in the region;

    (B) a receiving stream or underground water reservoir;

    (C) instream uses, water quality, aquatic and wildlife habitat, or beneficial freshwater inflows to bays and estuaries; or

    (D) affected persons;

(3) with respect to the alleged violator:

    (A) the history and extent of previous violations;

    (B) the degree of culpability, including whether the violation was attributable to mechanical or electrical failures and whether the violation could have been reasonably anticipated and avoided;

    (C) the demonstrated good faith, including actions taken by the alleged violator to rectify the cause of the violation and to compensate affected persons;

    (D) economic benefit gained through the violation; and

    (E) the amount necessary to deter future violations; and

(4) any other matters that justice may require.

Although the Water Code is silent regarding the role of geography in assessing fines, TCEQ argues that this statute, particularly subsection (4), provides ample discretion to include the penalty assessed here.

In *Slay*, the ALJ recommended that each violation of statute be considered on a facility-wide basis, but TCEQ determined that, because the property comprised four separate tracts owned by four separate entities, separate violations should be found for each tract/entity.

15

351 S.W.3d at 551. TCEQ assessed the violations pursuant to methodology contained in its "Penalty Policy," a document created by TCEQ's enforcement division to facilitate application of Water Code § 7.053. *See id.* at 538. We held that the penalty policy was not a rule requiring notice and comment under the Administrative Procedure Act because it governed only internal agency decision-making and was not binding on private parties. *Id.* at 548. This Court held that "given TCEQ's broad discretion in interpreting its own internal guidelines, the broad language of the Penalty Policy regarding determination of violations, and the evidentiary support" for the change, we could not find that TCEQ abused its discretion in making the change. *Id.* Similarly, we conclude that TCEQ had the discretion to change the ALJ's recommendation and assess the fines based on the "five discrete areas of observation" if the record supported that change. *See* Tex. Water Code § 7.053(4); *Slay*, 351 S.W.3d at 551.

TCEQ's grouping of the containers was supported by substantial evidence.

McHaney argues that there is no evidentiary support for the finding of five groups of waste containers. TCEQ investigator Kerlin testified that there appeared to be three areas of waste management activities that contained drums and that one of the areas contained nine tote tanks and a 1,600-gallon tank. In the summary section of his investigation report, Kerlin recited that he saw

> four hundred and ninety (490) 55-gallon drums accumulated along the southwest to eastern portion of the area. . . . [A] stationary box trailer along the eastern edge of the drum storage area. Visual inspection inside the trailer showed an indeterminate number of drums of unknown materials. . . . Visual inspection of the interior of the storage building showed approx one hundred (100) 55-gallon drums and nine (9) tote containers (both 350-gallon and 500-gallon) accumulated throughout the building. Additionally, one (1) approx one thousand six hundred (1,600) gallon tank was noted along the west wall of the building.

16

At the hearing, Kerlin testified that he saw three areas of waste management and discussed various containers he saw. The TCEQ commissioners essentially tracked his report language in amending the ALJ's proposed Conclusion of Law number 45 to state that there were "1) drums stored outside the facility along the southwest to eastern portions of the site; 2) drums stored in a stationary box trailer located on the eastern portion of the site; 3) drums stored inside the building; 4) nine tote tanks; and 5) one 1,600 gallon tank."

McHaney challenges some of the bases for the subdivision of the property. He notes that the investigation report stated that the box trailer was located along the eastern edge of the "drum storage area" not the eastern portion of "the site." He does not explain how this distinction is of any significance. McHaney also contends that it is not clear how the drums stored inside the building are discrete from the nine tote tanks and the 1,600-gallon tank that were also in the storage building. He does not, however, dispute evidence that the drums and tanks were on the property and contained waste or explain why the drums should not be grouped—particularly when that grouping serves to reduce his potential fine. We conclude that the challenged amendment to the conclusion is supported by substantial evidence in the record.

**TCEQ's action did not constitute impermissible ad hoc rulemaking.**

McHaney contends that TCEQ admitted that its rules for universal waste are unclear, that he was generally in compliance with the streamlined record-keeping rules, and that TCEQ used his record-keeping deficiencies to improperly announce new, clarified record-keeping rules. The record indicates that the fines were assessed pursuant to TCEQ's power to consider "any other matters that justice may require" and its penalty policy. *See* Tex. Water Code § 7.053(4); *Slay*,

17

351 S.W.3d at 551. The comment made by a TCEQ commissioner at a hearing that "if there is need for clarity in our rules, I would encourage our staff to look at that and see *if we need to go through the rule making* or provide some other guidance" (emphasis added) strongly implies that rulemaking is not occurring at that hearing. As discussed above, the record shows that TCEQ penalized McHaney under the existing rules. *See, e.g.*, 30 Tex. Admin. Code §§ 335.62, .503, .505-.508, .511, .513. The application of the existing rules and policies to consider a penalty for each container and to assess a penalty for each of five discrete areas of observation did not announce a new rule, merely an exercise of the discretion conferred by the Legislature. *See Slay*, 351 S.W.3d at 546-47. We conclude that McHaney has not shown that an improper ad hoc rulemaking occurred.

## CONCLUSION

We find no reversible error presented. We affirm the district court's order affirming the TCEQ commissioners' order.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose and Justice Pemberton;
   Former Chief Justice Jones not participating

Affirmed

Filed: February 27, 2015

18